RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

DEAUNTA BELCHER,

        *Defendant-Appellant*.

No. 22-1650

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:16-cr-20143-2—Victoria A. Roberts, District Judge.

Argued: October 25, 2023

Decided and Filed: February 9, 2024

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Royal Oak, Michigan, for Appellant. Jessica Currie, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Royal Oak, Michigan, for Appellant. Jessica Currie, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

JULIA SMITH GIBBONS, Circuit Judge. Deaunta Belcher was convicted, and sentenced to life in prison, for his participation in a murder-for-hire scheme, hindering the investigation of a federal offense, and for two other offenses. On direct appeal, Belcher raises

issues with both his murder-for-hire and obstruction convictions.  Specifically, Belcher argues that his murder-for-hire conviction is invalid because the government and the court constructively amended the indictment such that he was sentenced for a crime with which he was never charged.  Likewise, he claims that his obstruction conviction cannot stand because the government prejudicially varied from the indictment when it offered additional proof at trial to support the charge.  Belcher also attests that the district court erred when it denied his motion for judgment of acquittal on the obstruction charge.  For the reasons outlined below, we affirm.

I.

The facts of this case are uncontested and mirror those discussed in Belcher's co-defendant's case.  *See United States v. Watson*, 852 F. App'x 164, 166–67 (6th Cir. 2021).  In short, Darnell Bailey, Devin Wallace, and Deaunta Belcher were engaged in a car-fraud scheme, which was also tangentially related to drug trafficking.  At some point, tension between the schemers started to mount.  Among other reasons for the tension, Wallace was indicted on federal drug charges, and the others thought he started to cooperate with the Drug Enforcement Administration (DEA) as a result.  Belcher's and Bailey's frustrations grew, and they began planning Wallace's murder.  Their plans intensified in August of 2015, when they linked up with Stephen Brown and Andre Watson, who agreed to kill Wallace in exchange for a house and a car.  Belcher kept in contact with Brown about the plan by phone on several occasions.  Then, on September 11, 2015, Belcher called Brown to let him know that he had located Wallace.  Brown arrived on the scene with Watson and another, Watson walked to Wallace's vehicle, and Watson shot Wallace multiple times, resulting in Wallace's death.

Law enforcement spoke with Belcher several times between Wallace's death and his ultimate arrest.  The first interaction occurred at the crime scene shortly after Wallace's murder.  Sergent Todd Eby interviewed Belcher as a potential witness to the crime.  Belcher told Eby that he did not witness the murder, but that he knew of Wallace and thought the murder may have occurred because Wallace was a DEA informant.  A few weeks later, two detectives interviewed Belcher with questions about his relationship with Brown, to which Belcher responded with lies.  Eventually, Belcher was arrested.

The government originally indicted Belcher on three counts: retaliating against a witness, victim, or an informant; conspiracy to retaliate against a witness, victim, or informant; and use of interstate commerce facilities in commission of a murder-for-hire. Each count carried a penalty of either death or life imprisonment, which Belcher acknowledged in a court filing. Later, the grand jury returned a superseding indictment, with only one charge remaining consistent. superseding indictment contained four charges: use of interstate commerce facilities in the commission of a murder-for-hire, conspiracy with the intent to distribute cocaine and oxycodone, use of a firearm during and in relation to a drug trafficking crime causing death, and misleading communication to hinder investigation of a federal offense. Once again, Belcher acknowledged the charges and the limits of punishment on each count. Belcher proceeded to trial, where the jury found him guilty on all counts. The district court sentenced Belcher to life imprisonment for his murder-for-hire charge and ten years, to run concurrently with the life sentence, on each of the other three counts. This appeal followed.

II

Belcher makes three arguments on appeal. First, he argues that his superseding indictment was constructively amended when the government sought, and the court enabled, punishment under the "death results" element of § 1958(a) throughout the trial process. Next, Belcher asserts that his indictment was materially varied as to his § 1512(b)(3) charge. Finally, he claims that the district court erred in denying his oral and written motions for acquittal on the § 1512(b)(3) charge because the government submitted insufficient proof to convict him.

A. *Constructive Amendment.*

Typically, this court assesses claims of a constructive amendment or variance to an indictment de novo. *United States v. Mize*, 814 F.3d 401, 408 (6th Cir. 2016); *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007). However, when a defendant fails to object and preserve an indictment modification issue, the court reviews only for plain error. *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008). To establish plain error, "there must be (1) 'error,' (2) that is 'plain,' (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "If all three conditions

are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (internal quotation marks omitted).

This court has acknowledged that an indictment can be modified in one of three ways: amendment, variance, and constructive amendment. *Budd*, 496 F.3d at 521. An indictment is actually amended when a prosecutor or court changes the text of the document. *Id*; *see also United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989). As for a variance or constructive amendment, however, the language of the indictment remains the same while the basis for its charges is altered throughout the trial process. *See Mize*, 814 F.3d at 409. For example, a variance occurs when "the evidence at trial proves facts materially different from those alleged" explicitly in the indictment. *United States v. Prince*, 214 F.3d 740, 756–57 (6th Cir. 2000) (quoting *United States v. Flowal*, 163 F.3d 956, 962 (6th Cir. 1998)). An indictment is constructively amended, on the other hand, when its terms are "altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) (quoting *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003)).

Although "the distinction between a variance and a constructive amendment is sketchy, the consequences of each are significantly different." *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002). A constructive amendment is "per se prejudicial," because it violates a person's Fifth Amendment grand jury protections and principles of notice and fairness, while a variance warrants reversal only if it "affect[s] a substantial right of the defendant." *Kuehne*, 547 F.3d at 683 (internal quotation marks omitted).

Belcher claims the government constructively amended count one of the superseding indictment related to his charge under 18 U.S.C. § 1958(a). Belcher points out that the superseding indictment omits the "death results" statutory alternative element, but that the element was included in the jury instructions and on the verdict form, and that the government argued that Belcher's involvement in the murder-for-hire scheme caused Wallace's death. Given these events, and because the "death results" clause is a necessary element of his convicted

offense, *see Mathis v. United States*, 579 U.S. 500, 518 (2016), Belcher contends that plain error review requires reversal of his conviction, and that the conviction violated his Fifth and Sixth Amendment rights.

In response, the government argues both that it did not constructively amend Belcher's superseding indictment and that Belcher's claims cannot survive plain error review. Speaking to the former, the government claims that Belcher's indictment contains an *Apprendi* error that did not amount to a constructive amendment. As to the latter, it contends that Belcher's claims fail to satisfy both the third and fourth elements of the onerous standard. The government is only partially correct, but enough so for us to affirm Belcher's conviction.

The government constructively amended Belcher's superseding indictment as to his charge under 18 U.S.C. § 1958(a). Section 1958(a) is the federal murder-for-hire statute. The statute criminalizes both interstate travel and the use of a facility of interstate commerce with the intent to commit murder. 18 U.S.C. § 1958(a). In order for the government to convict a person under the statute's use of a facility of interstate commerce component, it must prove that a person (1) used or "caused a person to use any facility of interstate commerce, (2) with the intent that a murder be committed, in violation of the laws of [a state], and (3) that the murder was to be committed as consideration for the promise or agreement to pay anything of pecuniary value." *United States. v. Acierno*, 579 F.3d 694, 699 (6th Cir. 2009). A person convicted under this base-line variation of the statute faces a maximum sentence of ten years imprisonment. 18 U.S.C. § 1958(a).

However, the statute also contains alternative, enhanced punishments when the murder-for-hire scheme results in either physical injury, requiring a statutory maximum of twenty years, or death, mandating a sentence of death or life imprisonment. *Id.* And because these statutory alternatives carry different punishments, they are essential elements of their respective offenses[1] that must be charged in an indictment, submitted to the jury, and proved beyond a reasonable

---

[1]Because the statutory punishments "require[] proof of an additional fact that the other[s] do[] not," each alternative is its own offense. *U.S. v. Combs*, 369 F.3d 925, 932 (6th Cir. 2004) (citing *U.S. v. Davis*, 306 F.3d 398, 415–16 (6th Cir. 2002)).

doubt. *See Mathis*, 579 U.S. at 517–18; *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

The government skipped the first step here. Although it clearly charged Belcher under § 1958(a), neither the superseding indictment nor the original mentions death resulting from his involvement in a murder-for-hire scheme. Based on these documents alone, Belcher could anticipate serving only up to ten years imprisonment for the charge if convicted. Despite the contents of the superseding indictment, the government's proposed jury instructions included the death results element. Additionally, the government argued at trial that Belcher's involvement in the scheme caused Wallace's death. At the end of the trial, the court instructed the jury on the § 1958(a) charge and included the death results element, of which the jury later convicted Belcher. Because the jury instructions and the government's presentation modified and altered the essential elements of the § 1958(a) charge in his superseding indictment, creating, in effect, a new charge, Belcher's indictment was constructively amended.

The existence of a constructive amendment, however, is not the end of this inquiry. Belcher failed to raise the issue throughout the trial process, so we review the matter for plain error. The government concedes that Belcher met the first two prongs of plain error review, but argues that Belcher cannot satisfy the third and fourth prongs of the test. We address its argument as to each prong in order.

As to the third prong, the government claims that Belcher's constructive amendment argument essentially raises an *Apprendi* error, and that said "errors are not structural" and are subject to harmless error analysis. The government relies on *Washington v. Recuenco*, 548 U.S. 212 (2006)—where the Supreme Court held that "[f]ailure to submit a sentencing factor to the jury," and instead having an element of a charge found by a judge, "is not structural error"—to further support its claim.[2] *Id.* at 222.

Although some constructive amendments include an *Apprendi* error, the nature, circumstances, and impact of the respective defects are distinct. An *Apprendi* error and the error

---

[2]The Court found that this error is functionally the same as the error in *Neder v. United States*, 527 U.S. 1 (1999), which addressed the failure to submit an element to the jury, as opposed to a sentencing factor, through harmless error analysis. *Washington v. Recuenco,* 548 U.S. 212, 219–222 (2006).

addressed in *Neder* and *Recuenco* impact a defendant's rights at a discrete moment during the trial process. *Apprendi* errors, for example, stem only from judicial overreach post-verdict, or guilt admission, whereas the type of error discussed in *Neder* and *Recuenco* occurs only on judicial usurpation of the jury's responsibility as a factfinder. Constructive amendments, however, infect the entirety of a criminal case. Not only does the amendment obliterate a defendant's grand jury rights, but, in moving the goalposts, it also raises notice and due process concerns while limiting a defendant's ability to prepare for trial. Every step in the life cycle of a criminal case—from the grand jury's finding of probable cause to the issuing of an indictment, a defendant's trial preparation and execution, the reading of jury instructions, and sentencing—is impacted by a constructive amendment. And because the entirety of the process is disrupted, this court has found constructive amendments to be per se prejudicial. *Kuehne*, 547 F.3d at 683. As a result, Belcher has satisfied the third prong of the plain error standard. *See United States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005).

We agree with the government, however, that Belcher does not meet the fourth prong and, therefore, is not entitled to relief. Despite the fact that the superseding indictment was constructively amended, there is no question, looking at the record, that Belcher was aware that the government intended on charging him under the "death results" statutory enhancement of § 1958. For example, Belcher signed an acknowledgement form related to both his original and superseding indictments that explained that he would be sentenced only to death or life imprisonment if convicted on the § 1958(a) charge, a penalty authorized only by the "death results" enhancement.[3] *See* 18 U.S.C. § 1958(a). In addition to Belcher's own acknowledgements, the government made clear in its filings, outside of the indictments, that it intended to pursue the enhanced punishment under the "death results" element, and the court, on two occasions and with Belcher present, vocalized that Belcher faced life imprisonment on his § 1958(a) charge.

---

[3]In his reply brief, and at oral argument, Belcher points to the audio recording of his second arraignment to note that the matter was "de-certified for death," and that he did not expect an enhanced punishment. But that argument misses the mark. Because Belcher signed an acknowledgment form indicating that the possible punishments for being found guilty under § 1958(a) was *either* life imprisonment *or* a death sentence, and the government did not pursue the death penalty, life imprisonment was the only foreseeable punishment.

The breadth of information in the record highlighting Belcher's possible punishment, and his knowledge of that punishment, alleviates the notice and due process concerns created by the constructive amendment. Of course, the instances highlighted in the record do not remedy the constructive amendment's violation of Belcher's grand jury protections, but a violation of that right alone does not satisfy the plain error standard, especially after a jury conviction. *See United States v. Cotton*, 535 U.S. 625, 634 (2002).

Ultimately, although Belcher's superseding indictment was constructively amended through the trial process and jury instructions, because he had notice that the government was pursuing an enhanced penalty on his § 1958(a) charge from the outset, the error did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (internal quotations omitted). As a result, we uphold Belcher's conviction under the § 1958(a) charge.

## B. *Indictment Variance.*

Next, Belcher argues that the government impermissibly varied his indictment as to count four, related to his charge under 18 U.S.C. § 1512(b)(3). Specifically, he says that the government responded to his oral and written acquittal motions "based on statements by Defendant other than those charged in the indictment as a basis to sustain Defendant's conviction." CA6 R. 18, Appellant Br., at 20. Belcher states that the government's behavior constituted a prejudicial variance because it violated the longstanding principle that, "[o]nce the indictment presents a factual basis for an element of a crime, the prosecution may not rest its proof of that element of the crime at trial on other facts." *United States v. Caldwell*, 176 F.3d 898, 902 (6th Cir. 1999).

In its response, the government argues that no variance occurred because the statements listed in the indictment established the factual basis for a different element of the § 1512(b)(3) charge than the one contested in Belcher's acquittal motions. We agree.

To convict a defendant under 18 U.S.C. § 1512(b)(3), "the government must prove that the defendant (1) knowingly and willfully engaged in misleading conduct toward another person, (2) with the intent to hinder, delay, or prevent the communication of information to a federal

official, (3) about the commission or the possible commission of a federal crime." *United States v. Carson*, 560 F.3d 566, 580 (6th Cir. 2009). Supplying a factual basis for one of these elements in an indictment does not, of course, preclude the government from offering additional evidence at trial to prove the remaining ones.

Here, Belcher's superseding indictment alleged that, "[o]n or about September 24, 2015," he "knowingly engage[d] in misleading conduct toward another person, Detroit Police Detectives Kelly Lucy and John Mitchell, by" making three specific statements. DE 141, Sup. Indictment, PageID 616. The superseding indictment continued by asserting that Belcher made those three statements "with the intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to" the murder-for-hire offense. In both his oral and written motions for acquittal, Belcher disputes only the second element of § 1512(b)(3) related to the federal nexus. The government then argued that a federal nexus existed because Belcher, on September 11, 2015, told Detroit detectives that Wallace was murdered because he was a DEA informant.

Contrary to Belcher's belief, the government did not "pivot its factual theory of the [§ 1512(b)(3)] charge" or vary the superseding indictment by referencing trial testimony to meet the federal nexus element. The statements included in Belcher's superseding indictment form the factual basis for only the first element of the offense. And because it need not list every possible factual basis for an element of a crime in an indictment, the government did not impermissibly vary Belcher's superseding indictment with reference to evidence uncovered at trial in response to his motions for acquittal. *See Kuehne*, 547 F.3d at 696.

## C. *Sufficiency of the Evidence.*

Finally, Belcher asserts that the district court erred in denying his motions for acquittal because the government failed to offer sufficient evidence to convict him on the § 1512(b)(3) charge. In particular, he contends that the government failed to prove two necessary elements of the underlying offense because "there is nothing about Defendant's misleading statements to local Detectives Lucy or Mitchell that implicate an intent to hinder a federal official or a possible

federal investigation." CA6 R. 18, Appellant's Br., at 20. Considering the trial record, however, we disagree.

We review a challenge to the sufficiency of the evidence supporting a conviction de novo. *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). In reviewing such a challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Further, "[w]e draw all available inferences and resolve all issues of credibility in favor of the jury's verdict, and it is not necessary for us to exclude every reasonable hypothesis but guilt." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). With that said, a defendant challenging the sufficiency of the evidence "bears a very heavy burden." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 734, 746 (6th Cir. 1999)).

As discussed above, the government must prove three elements to convict a person under § 1512(b)(3). Belcher concedes that the government presented evidence that he made misleading statements to local law enforcement officers, but claims that the government did not show that he intended to "hinder, delay, or prevent communication or information 'to a federal official'" or that said communication related to the possible communication of a federal offense. CA6 R. 18, Appellant's Br. at 18. To support this point, Belcher gestures to our decision in *United States v. Carson*, 560 F.3d 566 (6th Cir. 2009), which addresses these matters.

Like Belcher, Carson challenged the sufficiency of the government's evidence as to the "federal nexus" element. *Id.* at 580. Carson alleged that his misleading conduct could not have been intended to hinder communication to federal law enforcement because his conduct occurred months before a federal investigation began. *Id.* This court, however, held that the government's showing that the involved law enforcement officers received training about the consequences of using excessive force, and the possibility of federal investigations stemming from allegations of the same, was sufficient evidence to create a federal nexus. *Id.* at 581. We reasoned, relying on Eleventh Circuit precedent, that the federal nexus element is satisfied "if the misleading information is *likely* to be transferred to a federal agent." *Id.* at 580 (quoting *United States v. Ronda*, 455 F.3d 1273, 1285 (11th Cir. 2006)). The basis for this broad reasoning

comes from the purpose of § 1512(b)(3), which is "the federal interest of protecting the integrity of *potential* federal investigations by ensuring that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 581 (quoting *Ronda*, 455 F.3d at 1286–87). As it stands, the federal nexus requirement deals in the hypothetical and does not require the government to prove that the information actually made its way to federal agents.

Given the broad interpretation of § 1512(b)(3)'s federal nexus element, the record supports a finding that the government offered sufficient evidence at trial to convict Belcher of the offense. The government noted that Belcher met with local law enforcement three times after the murder and before his arrest. On the first interaction, and at the scene of the crime, Belcher told Sergeant Todd Eby three things: that he was not a witness to the crime, that he was familiar with Wallace, and that Wallace may have been killed because he cooperated with the DEA. Seemingly unbeknownst to Belcher, Sergeant Eby "reached out to Drug Enforcement" after this interaction and "a DEA agent responded to the scene."[4] About a week after the crime, Belcher then met with Detective Williams to record a written statement. Finally, about a week after that, Detectives Lucy and Mitchell met with Belcher for several hours. The detectives sought to ask Belcher about his connection with various suspects. In that interview, Belcher commented that Wallace "had dealings with the Mexicans, and [that his murder] was over narcotics."

The evidence at trial shows that Belcher tried to deceive law enforcement from the outset. One of the ways that he chose to deceive law enforcement was to suggest that the shooter killed Wallace because he was an informant for the DEA. A person's reference to a federal agency does not make it "likely" that that information will be transferred to federal law enforcement. Viewing the evidence in the light most favorable to the prosecution, however, when, as here, a person repeatedly peddles a narrative that a deadly event took place *because* of the victim's involvement with federal law enforcement, a juror could find the federal nexus element satisfied. This is true even when the alleged misleading statements are not about the killer's motives, but about the speaker's attempt to avoid detection. Because Belcher's statements to local law

---

[4]The government also submitted evidence that other investigators working on Wallace's murder met with federal agents from the DEA and the Bureau of Alcohol, Tobacco, Firearms and Explosive (ATF).

enforcement made it likely that federal law enforcement would associate with this case, and because Belcher made misleading statements to distract law enforcement officers from his involvement in the murder, there is sufficient evidence in the record for a juror to find that Belcher committed the offense charged under § 1512(b)(3).

III.

For the foregoing reasons, we affirm.